KIRSTEN M. WHEATLEY[1] vs. MASSACHUSETTS INSURERS INSOLVENCY FUND.

Plymouth. January 4, 2010. - April 27, 2010.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Massachusetts Insurers Insolvency Fund. Consumer Protection Act,* Availability of remedy, Insurance. *Insurance,* Insolvency of insurer, Unfair act or practice, Settlement of claim.

Discussion of the two circumstances in which a consumer may commence an action under G. L. c. 93A, § 9 (1). [598-599]

Discussion of the 1996 amendment to G. L. c. 176D, which added the Massachusetts Insurers Insolvency Fund to the definition of "person" in that chapter. [599-600]

Discussion of the standard of review applicable to the allowance of a motion for judgment on the pleadings, and of the principles of statutory construction. [600-601]

This court concluded that the 1996 amendment to G. L. c. 176D, which added the Massachusetts Insurers Insolvency Fund (insolvency fund) to the definition of "person" in that chapter, had the effect of subjecting the insolvency fund to consumer actions brought pursuant to G. L. c. 93A, § 9 (1). [601-611]

CIVIL ACTION commenced in the Superior Court Department on August 31, 2006.

The case was heard by *Robert C. Rufo,* J., on a motion for judgment on the pleadings.

The Supreme Judicial Court granted an application for direct appellate review.

*Stanley W. Wheatley* for the plaintiff.

*Joseph C. Tanski (Kurt Mullen* with him) for the defendant.

MARSHALL, C.J. General Laws c. 176D defines and regulates "unfair methods of competition and unfair or deceptive acts or practices in the business of insurance."[2] G. L. c. 176D, § 3. General Laws c. 93A, § 9 (1), in turn, provides, among other

_____

[1]By her mother and next friend, Sigrid M. Wheatley.

[2]In 1972, the Legislature amended the General Laws by striking out G. L.

things, that a consumer "whose rights are affected by another person violating the provisions of" G. L. c. 176D, § 3 (9), may bring an action in the Superior Court for damages and equitable relief. In 1996, the Legislature amended G. L. c. 176D, § 1 (*a*), adding the Massachusetts Insurers Insolvency Fund (insolvency fund), as well as joint underwriting associations, to the definition of "person" as that term is defined in G. L. c. 176D. St. 1996, c. 313 (1996 amendment). The 1996 amendment was adopted in the wake of *Barrett* v. *Massachusetts Insurers Insolvency Fund*, 412 Mass. 774, 777 (1992) (*Barrett*), and *Poznik* v. *Massachusetts Med. Professional Ins. Ass'n*, 417 Mass. 48, 53 (1994) (*Poznik*), in which this court held, respectively, that the insolvency fund (in *Barrett*) and the Massachusetts Medical Professional Insurance Association (medical insurance association), a joint underwriting association (in *Poznik*), were not subject to suit under G. L. c. 93A. In this consumer action against the insolvency fund, we are asked to determine whether the 1996 amendment caused the insolvency fund to be subject to G. L. c. 93A, among other things.

General Laws c. 176D, § 1 (*a*), provides, in pertinent part, that a "[p]erson" is "any individual, corporation, association, . . . any other legal entity or self insurer which is engaged in the business of insurance, including agents, brokers, and adjusters, the Massachusetts Insurers Insolvency Fund and any joint underwriting association established pursuant to law."[3] The insolvency fund argues that its placement in that definitional

---

c. 176D, inserted by St. 1947, c. 659, entitled "Unfair Methods of Competition and Unfair and Deceptive Acts and Practices in the Business of Insurance," and inserting in place thereof a new c. 176D, with the same title, addressing the same subject. St. 1972, c. 543, § 1.

[3]General Laws c. 176D, § 1 (*a*), as amended through St. 1996, c. 313 (1996 amendment), provided:

> "When used in this chapter, the following words shall have the following meanings except as otherwise specifically provided: (*a*) 'Person', any individual, corporation, association, partnership, reciprocal exchange, inter-insurer, Lloyds insurer, fraternal benefit society, operators of any medical service plan and hospital service plan as defined in chapters [176B, 176C, 176E, and 176F], insurers and sponsors of a legal services plan as defined in chapter [176H], any other legal entity or self insurer which is engaged in the business of insurance, including agents, brokers, and adjusters, *the Massachusetts Insurers Insolvency Fund and any joint underwriting association established pursuant to law.* For purposes

section after the words "in the business of insurance" and after the words "including agents, brokers, and adjusters," supports a conclusion that it is a "person" for some purposes of G. L. c. 176D, but it is not a person "engaged in the business of insurance" for all purposes of that chapter. The insolvency fund, it argues, is subject to investigation and enforcement by the Commissioner of Insurance (commissioner) under G. L. c. 176D, but it is not subject to consumer actions under G. L. c. 93A. A judge in the Superior Court agreed and allowed the insolvency fund's motion for judgment on the pleadings. See Mass. R. Civ. P. 12 (c), 365 Mass. 754 (1974). We granted the plaintiff's application for direct appellate review. For the reasons stated below, we conclude that the 1996 amendment had the effect of subjecting the insolvency fund, among other things, to consumer actions brought pursuant to G. L. c. 93A, § 9 (1). Accordingly, we reverse the judgment.

1. *Facts.* We briefly summarize the allegations of the complaint, which we take as true. *Jarosz* v. *Palmer,* 436 Mass. 526, 529-530 (2002) ("In deciding a rule 12 [c] motion, all facts pleaded by the nonmoving party must be accepted as true").

In July, 2003, Legion Insurance Company (Legion), a Pennsylvania company that provided insurance for the town of Duxbury (town), was declared insolvent by a Pennsylvania court. Accordingly, pursuant to G. L. c. 175D, § 5 (1), the insolvency fund became obligated to pay certain claims arising under policies issued by Legion and to "adjust, compromise, settle and pay covered claims to the extent of the [insolvency fund's] obligation," G. L. c. 175D, § 5 (1) (*d*).[4] One of the claims

---

of this chapter, operators of any medical and hospital service plans shall be deemed to be engaged in the business of insurance." (The italicized language was added by St. 1996, c. 313.)

The 1996 amendment did not include the word "and" before the phrase "any other legal entity or self insurer." St. 1996, c. 313.

In 2003, the Legislature rewrote the definition to include "carriers and health maintenance organizations as defined in chapter 176G." See St. 2003, c. 141, § 33. That language is not at issue in this case.

[4]The Massachusetts Insurers Insolvency Fund (insolvency fund) is a "statutorily mandated, nonprofit, unincorporated association of all insurers writing certain kinds of direct insurance in the Commonwealth . . . available to settle certain unpaid claims which arise out of and are within the coverage

concerned a negligence action commenced against the town by a student injured in the following circumstances.

In 2001, the plaintiff, Kirsten M. Wheatley, at the time a seven year old special education student who required the use of a walker and adult supervision to walk, was a student at a Duxbury public elementary school. On October 26, 2001, while walking to the school lunch room, Wheatley's walker collided with an obstacle on the floor of the hallway as she was leaving the special education center. Falling forward, she fractured a front tooth. She was then permitted by a school nurse to eat her lunch, during which she swallowed a different tooth knocked loose by the fall. In July, 2004, following unsuccessful negotiations with the town described below, Wheatley filed a negligence action against the town seeking to recover damages for these injuries. The case went to trial, and in April, 2008, a jury awarded Wheatley $20,786.31.

Wheatley first presented her claims to the town in August, 2003, see G. L. c. 258, § 4, approximately one month after Legion had been declared insolvent. Neither the town nor the insolvency fund responded to Wheatley's presentment letter.[5] When Wheatley filed her negligence action against the town, the insolvency fund defended the town, denying liability and asserting various affirmative defenses. Wheatley alleges that, by November, 2004, some fourteen months after Wheatley had made demand on the town and three months after she had commenced her negligence action against it, the insolvency fund had made no offer to settle her claims. She thereupon sent to the insolvency fund a demand letter pursuant to G. L. c. 93A, § 9 (3), to which the insolvency fund did not respond within thirty days of receipt.[6] Wheatley alleges here that at "all times

---

of an insurance policy issued by an insolvent insurer." *Barrett* v. *Massachusetts Insurers Insolvency Fund*, 412 Mass. 774, 776 (1992) (*Barrett*), quoting *Commissioner of Ins.* v. *Massachusetts Insurers Insolvency Fund*, 373 Mass. 798, 799 (1977).

[5]In its answer, the insolvency fund averred that it did respond to Wheatley by letter dated January 19, 2004, an assertion we do not consider as we take all facts alleged by Wheatley as true. See *Jarosz* v. *Palmer*, 436 Mass. 526, 529-530 (2002).

[6]In its answer, the insolvency fund acknowledged that it had received Wheatley's letter on November 3, 2004, and averred that it responded by letter dated December 16, 2004, an assertion we do not consider. See note 5, *supra*.

relevant" the town's liability was "reasonably clear," because she was in the town's "exclusive care, custody and control at the time of the accident" and was "unable to exercise any degree of care to protect herself from injury" because of her age and disabilities.

In August, 2006, some twenty-two months after sending her G. L. c. 93A demand letter to the insolvency fund, Wheatley commenced this action alleging that the insolvency fund had not "effectuated a prompt, fair and equitable settlement" of her claims, and that in the course of its defense of the town in the underlying negligence action, the insolvency fund had engaged in "multiple" unfair claims settlement practices in "willful" violation of G. L. c. 176D, § 3 (9), and G. L. c. 93A, § 2, including failure "to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies," in violation of G. L. c. 176D, § 3 (9) (*b*); failure "to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies," in violation of G. L. c. 176D, § 3 (9) (*c*); refusal to pay her claim "without conducting a reasonable investigation based upon all available information," in violation of G. L. c. 176D, § 3 (9) (*d*); and failure "to effectuate prompt, fair and equitable settlement[]" of a claim "in which liability ha[d] become reasonably clear," in violation of G. L. c. 176D, § 3 (9) (*f*). The insolvency fund moved for judgment on the pleadings, which (as noted earlier) was allowed by a judge in the Superior Court.[7]

2. *Discussion.* a. *The statutory scheme.* A consumer such as Wheatley may commence an action in the Superior Court under G. L. c. 93A, § 9 (1), in two circumstances. *Hopkins* v. *Liberty Mut. Ins. Co.*, 434 Mass. 556, 564-565 (2001), and cases cited (noting two circumstances).[8] Under the first prong of § 9 (1), a

---

[7]Wheatley commenced the present action against the insolvency fund before the conclusion of the underlying negligence action. A judge in the Superior Court allowed the insolvency fund's motion to stay discovery in this action and to suspend the tracking order pending resolution of the underlying negligence action. When judgment entered in the underlying negligence action, discovery in this action resumed. A different judge in the Superior Court entered judgment for the insolvency fund on its motion for judgment on the pleadings.

[8]General Laws c. 93A, § 9 (1), provides, in pertinent part: "Any person, other than a person entitled to bring action under section eleven of this

consumer who has been "injured by another person's use or employment of any method, act or practice declared to be unlawful by" G. L. c. 93A, § 2,[9] or "any rule or regulation issued thereunder" may bring an action in the Superior Court for damages and equitable relief. G. L. c. 93A, § 9 (1). Under the second prong of the statute, a consumer "whose rights are affected by another person violating the provisions of" G. L. c. 176D, § 3 (9),[10] may do so. G. L. c. 93A, § 9 (1). A consumer asserting a claim under the second prong of G. L. c. 93A, § 9 (1), may recover damages for violations of G. L. c. 176D, § 3 (9), "without regard to whether the violation was unlawful under G. L. c. 93A, § 2." *Polaroid Corp.* v. *Travelers Indem. Co.*, 414 Mass. 747, 754 (1993). This is because of the "explicit statement to that effect" in § 9 (1). *Id.* Wheatley asserts claims under both prongs of G. L. c. 93A, § 9 (1).

b. *The 1996 amendment to G. L. c. 176D.* In *Barrett, supra* at 775, a consumer sought to recover damages from the insolvency fund under the first prong of G. L. c. 93A, § 9 (1).[11] Reasoning that the insolvency fund is, "in essence, simply a conduit to which certain noninsolvent insurers, authorized to do business in the Commonwealth, pay a pro rata amount to enable" the insolvency fund "to pay 'covered claims' to insureds whose insurance companies become insolvent subsequent to the issuance of their policies and claims," this court held that a consumer could not maintain a G. L. c. 93A claim against the

---

chapter, who has been injured by another person's use or employment of any method, act or practice declared to be unlawful by section two or any rule or regulation issued thereunder *or* any person whose rights are affected by another person violating the provisions of clause (9) of section three of chapter one hundred and seventy-six D may bring an action in the superior court . . . for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper" (emphasis added).

[9]General Laws c. 93A, § 2 (*a*), declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ."

[10]General Laws c. 176D, § 3, "prohibits 'unfair or deceptive acts or practices in the business of insurance,' and § 3 (9) enumerates acts and omissions that constitute unfair claim settlement practices." *Hopkins* v. *Liberty Mut. Ins. Co.*, 434 Mass. 556, 564 (2001).

[11]In *Barrett, supra* at 775-777, the plaintiff's complaint made no reference to G. L. c. 176D, and the court made no mention of a claim under the second prong of G. L. c. 93A, § 9 (1). The court analyzed the plaintiff's claims solely under the first prong of G. L. c. 93A, § 9 (1). See *Barrett, supra.*

insolvency fund because the insolvency fund "does not engage in a 'trade' or 'commerce' and its activities are not performed within a 'business context.' " *Barrett, supra* at 775, 776-777. Shortly thereafter, in *Poznik, supra* at 50, 52-53, this court held that the medical insurance association also was not subject to suit under G. L. c. 93A, describing the medical insurance association as a statutorily mandated, "temporary, nonexclusive, nonprofit joint underwriting association whose purpose is to provide medical malpractice insurance on a self-supporting basis." The court relied expressly on *Barrett* for its conclusion that the medical insurance association was "not engaged in 'trade or commerce' within the meaning of G. L. c. 93A," *Poznik, supra* at 53, reasoning that the "character" of the medical insurance association was "similar" to that of the insolvency fund, and that the medical insurance association's transactions, "like those" of the insolvency fund, are "motivated by legislative mandate, not business or personal reasons." *Id.* at 52, quoting *Barrett, supra* at 777.

Within eleven months of *Poznik*, the Legislature took action on two bills that eventually were merged and enacted as the 1996 amendment.[12] As noted earlier, the 1996 amendment provided that the insolvency fund and any joint underwriting association established pursuant to law be included in the definition of "person" as that term is used in G. L. c. 176D. St. 1996, c. 313. See note 3, *supra*. We turn now to consider whether the 1996 amendment subjected the insolvency fund to consumer actions pursuant to G. L. c. 93A, § 9 (1).

c. *Standard of review.* We review de novo the judge's order allowing a motion for judgment on the pleadings under rule 12 (c). *Okerman* v. *VA Software Corp.*, 69 Mass. App. Ct. 771, 775 (2007). See *Jarosz* v. *Palmer*, 436 Mass. 526, 529 (2002), quoting J.W. Smith & H.B. Zobel, Rules Practice § 12.16 (1974) (defendant's rule 12 [c] motion is "actually a motion to

---

[12]The decision in *Poznik* v. *Massachusetts Med. Professional Ins. Ass'n*, 417 Mass. 48 (1994) (*Poznik*), was issued on February 10, 1994. 1995 House Doc. No. 1109 and 1995 House Doc. No. 2594 were both referred to the Committee on Insurance in early January, 1995. On May 8, 1995, the Committee on Insurance reported a new draft, 1995 House Doc. No. 4950, combining certain portions of both bills. Following minor changes not relevant here, 1995 House Doc. No. 4950 was enacted and signed by the Governor on August 9, 1996. See St. 1996, c. 313.

dismiss" that "argues that the complaint fails to state a claim upon which relief can be granted"); *Minaya* v. *Massachusetts Credit Union Share Ins. Corp.*, 392 Mass. 904, 905 (1984), quoting *Burlington* v. *District Attorney for the N. Dist.*, 381 Mass. 717, 717-718 (1980) ("effect of a motion for judgment on the pleadings is 'to challenge the legal sufficiency of the complaint' "). Moreover, the issue in this case is one of statutory construction, which we also review de novo. *Commerce Ins. Co.* v. *Commissioner of Ins.*, 447 Mass. 478, 481 (2006).

Our primary duty in interpreting a statute is "to effectuate the intent of the Legislature in enacting it." *International Org. of Masters* v. *Woods Hole, Martha's Vineyard & Nantucket S.S. Auth.*, 392 Mass. 811, 813 (1984). Where the words of a statute are not ambiguous in their meaning, we "[o]rdinarily" view them as "conclusive as to legislative intent." *Sterilite Corp.* v. *Continental Cas. Co.*, 397 Mass. 837, 839 (1986). See *Telesetsky* v. *Wight*, 395 Mass. 868, 872 (1985) (statutory text "must be afforded its plain meaning when it is clear and unambiguous").[13]

Other rules of statutory construction are operative in this case. First, a statute must be construed so that "effect is given to all its provisions, so that no part will be inoperative or superfluous." *Bankers Life & Cas. Co.* v. *Commissioner of Ins.*, 427 Mass. 136, 140 (1998), quoting 2A N. Singer, Sutherland Statutory Construction § 46.05 (5th ed. 1992). See *Commonwealth* v. *McCaughey*, 9 Gray 296, 297 (1857) (this is "an anciently established rule"). Second, the "statute must be viewed 'as a whole'; it is 'not proper to confine interpretation to the one section to be construed.' " *Wolfe* v. *Gormally*, 440 Mass. 699, 704 (2004), quoting 2A N. Singer, Sutherland Statutory Construction § 46.05, at 154 (6th ed. 2000).

d. *The insolvency fund and G. L. c. 93A consumer actions.* As noted earlier, in *Barrett, supra* at 775, this court held that the insolvency fund was not subject to G. L. c. 93A consumer

---

[13]Conversely, where the words of a statute are ambiguous, the statute "must be interpreted according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." *Hanlon* v. *Rollins*, 286 Mass. 444, 447 (1934). See *Telesetsky* v. *Wight*, 395 Mass. 868, 872 (1985).

actions because it did not engage in " 'trade' or 'commerce' " as the court understood those terms. The insolvency fund now argues that its character has not changed since *Barrett*, that the reasoning in *Barrett* retains its full force, and thus that the insolvency fund should not now be subject to G. L. c. 93A consumer actions. We acknowledge the point, but as we now explain, we are compelled by the language of the 1996 amendment to conclude that the Legislature has dictated otherwise.

First, all the operative provisions of G. L. c. 176D that use the term "[p]erson" as defined in G. L. c. 176D, § 1 (*a*) — which together set forth procedures for the regulation of unfair methods of competition and unfair or deceptive acts or practices in the business of insurance, G. L. c. 176D, § 2 — apply to persons who engage "in the business of insurance." See G. L. c. 176D, § 2 (prohibiting any "person" from engaging in certain acts "in the business of insurance");[14] G. L. c. 176D, § 3 (defining certain acts as unfair or deceptive "in the business of insurance," and using the term "person" in subsections [1] [*d*], [2], [3], [5], and [10]);[15] G. L. c. 176D, § 5 (providing commissioner power to investigate into affairs of "every person engaged

---

[14]General Laws c. 176D, § 2, provides: "No person shall engage in this commonwealth in any trade practice which is defined in this chapter as, or determined pursuant to section six of this chapter to be, an unfair method of competition or an unfair or deceptive act or practice in the business of insurance."

[15]General Laws c. 176D, § 3, provides, in pertinent part: "The following are hereby defined as unfair methods of competition and unfair or deceptive acts or practices in the business of insurance . . . ." Such acts or practices include "issuing, circulating, or causing to be made, issued or circulated, any estimate, illustration, circular or statement which . . . [m]isleads or misrepresents the financial condition of any person or the legal reserve system upon which any life insurer operates," G. L. c. 176D, § 3 (1) (*d*); "making, publishing, disseminating, circulating, or placing before the public . . . an advertisement, announcement or statement containing any assertion, representation or statement with respect to the business of insurance or with respect to any person in the conduct of his insurance business, which is untrue, deceptive or misleading," G. L. c. 176D, § 3 (2); "making, publishing, disseminating, or circulating, directly or indirectly, . . . any oral or written statement . . . which is false, or maliciously critical of or derogatory to the financial condition of any person, and which is calculated to injure such person," G. L. c. 176D, § 3 (3); "knowingly making, publishing, disseminating, circulating or delivering to any person, or placing before the public, or knowingly causing directly or indirectly, to be made, published, disseminated, circulated, delivered to any person, or placed before the public, any false material statement of fact as to the financial condition of a person; or . . . knowingly mak-

in the business of insurance in this commonwealth");[16] G. L. c. 176D, § 6 (setting forth procedures for commissioner to follow when investigating "any such person," i.e., any person described in G. L. c. 176D, § 5, as "person engaged in the business of insurance");[17] G. L. c. 176D, § 7 (setting forth penalties commissioner may enforce against "person charged" under G. L. c. 176D, §§ 6, 7);[18] G. L. c. 176D, § 8 (setting forth procedures for review for "[a]ny person" subject to cease and desist order issued by commissioner under G. L. c. 176D, § 6);[19] G. L. c. 176D, § 10 (setting forth sanctions for "[a]ny person" who violates cease and desist order issued by commissioner under

ing any false entry of a material fact in any book, report or statement of any person or knowingly omitting to make a true entry of any material fact pertaining to the business of such person in any book, report or statement of such person," G. L. c. 176D, § 3 (5); and "failure of any person to maintain a complete record of all of the complaints which it has received since the date of its last examination, which record shall indicate in such form and detail as the [Commissioner of Insurance (commissioner)] may from time to time prescribe, the total number of complaints, their classification by line of insurance, and the nature, disposition, and time of processing of each complaint," G. L. c. 176D, § 3 (10).

[16]General Laws c. 176D, § 5, provides: "The commissioner shall have the power to examine and investigate into the affairs of every person engaged in the business of insurance in this commonwealth in order to determine whether such person has been or is engaged in any unfair method of competition or in any unfair or deceptive act or practice prohibited by section two."

[17]General Laws c. 176D, § 6, provides, in pertinent part: "Whenever the commissioner shall have reason to believe that any *such* person has engaged or is engaging in this commonwealth in any unfair method of competition or any unfair or deceptive act or practice whether or not defined in sections three or four and that a proceeding by him in respect thereto would be to the interest of the public, [the commissioner shall hold a hearing following certain procedures]" (emphasis added).

[18]General Laws c. 176D, § 7, provides, in pertinent part: "If after such hearing, the commissioner shall determine that the person charged has engaged in an unfair or deceptive act or practice he shall reduce his findings to writing and shall issue and cause to be served upon the person charged with the violation a copy of such findings and an order requiring such person to cease and desist from engaging in such method of competition, act or practice and if the act or practice is a violation of sections three or four, the commissioner may suspend or in the case of repeated violations revoke the license of such a party and impose conditions for the reinstatement thereof."

[19]General Laws c. 176D, § 8, provides, in pertinent part: "Any person required by an order of the commissioner under section six to cease and desist from engaging in any unfair method of competition or any unfair or deceptive act or practice may obtain a review of such order . . . ."

G. L. c. 176D, § 7).[20] The only operative provision of the statute in which the term "person" is not coupled (either within the same section or through reference to some other section) with the modifier "in the business of insurance" appears in G. L. c. 176D, § 4,[21] and § 4 itself includes its own definition of "person." See G. L. c. 176D, § 4 (prohibiting certain practices in relation to issuance of insurance policies and lending of money or extension of credit by "any individual, corporation, association, partnership, or other legal entity whatsoever").[22] To conclude, as the insolvency fund argues, that the 1996 amendment defines the

[20]General Laws c. 176D, § 10, provides: "Any person who violates a cease and desist order of the commissioner under section seven after it has become final, and while such order is in effect, shall forfeit and pay to the commonwealth a sum not to exceed ten thousand dollars for each violation, which sum may be recovered in a civil action. Upon order of the commissioner such person shall be subject to suspension or revocation of such person's license or such other relief as is reasonable and appropriate."

[21]General Laws c. 176D, § 4, provides, in pertinent part: "No person may: [engage in certain practices in relation to issuance of insurance policies and lending of money or extension of credit]. . . . For the purposes of this section, 'person' includes any individual, corporation, association, partnership, or other legal entity whatsoever."

[22]Beyond G. L. c. 176D, § 4, see note 21, *supra*, and accompanying text, there are three uses of the term "person" in G. L. c. 176D that might be read to incorporate persons not engaged "in the business of insurance." Neither party makes any reference to these; none alters — and, if anything, they confirm — our analysis.

First, in setting forth the procedures that the commissioner shall follow for pursuing enforcement actions against suspected violators, G. L. c. 176D, § 6, states, among other things: "Upon good cause shown, the commissioner shall permit *any person* to intervene, appear and be heard by counsel or in person" in a hearing to determine whether the commissioner should issue a cease and desist order to a suspected violator (emphasis added). It defies credulity that the intent of the Legislature, in enacting the 1996 amendment, was solely to allow the insolvency fund and joint underwriting associations to intervene in hearings against other parties. The insolvency fund makes no such argument.

Second, G. L. c. 176D, § 13, which grants immunity from future prosecution for "any person" who asks to be excused from testifying or producing documents at the direction of the commissioner under G. L. c. 176D on the grounds that such testimony or documents might be self-incriminating, uses the term "person" to refer to natural persons; the section uses the term "[a]ny such individual" synonymously.

Third, G. L. c. 176D, § 3B, which sets forth certain requirements applying to a "carrier," as defined therein, "that offers insureds a restricted pharmacy network," defines the term "insured" to mean "a *person* whose health care services and benefits are provided by, or indemnified by or otherwise covered

insolvency fund as a "person," but not a person "engaged in the business of insurance," see *supra* at 596, would contravene the well-established rules of statutory construction articulated in *Bankers Life & Cas. Co.* v. *Commissioner of Ins.*, 427 Mass. 136, 140 (1998) (statute must be construed so that "effect is given to all its provisions, so that no part will be inoperative or superfluous"), and *Wolfe* v. *Gormally*, 440 Mass. 699, 704 (2004) ("statute must be viewed 'as a whole' ").[23]

Moving beyond the language of the statute, the intent of the 1996 amendment, the insolvency fund posits, is to "prohibit" the insolvency fund "from engaging in practices defined or determined to be unfair or deceptive acts or practices," and to "subject" the insolvency fund "to enforcement by" the commissioner. We agree, as far as that argument goes. But we do not agree that the intent of the Legislature can be entirely so circumscribed. The provisions of G. L. c. 176D, which give the commissioner "the power to examine and investigate into the affairs of every person engaged in the business of insurance in this commonwealth," G. L. c. 176D, § 5, and to pursue enforcement actions against "any such person," G. L. c. 176D, § 6, become operative only where a person has or might have engaged in insurance practices prohibited by G. L. c. 176D, § 2. That section prohibits a "person" from engaging in any act "defined in this chapter as,[24] or determined pursuant to section six of this chapter to be,[25] an unfair method of competition or an

---

by a carrier's group or individual insurance policy, or certificate, agreement or contract and shall include subscribers, enrollees or members" (emphasis added). As with G. L. c. 176D, § 13, the term "person" in G. L. c. 176D, § 3B, refers to natural persons. As with G. L. c. 176D, § 6, neither party argues that the use of the term "person" in G. L. c. 176D, § 13, or G. L. c. 176D, § 3B, has any bearing on the issue before us.

[23]We also disagree with the insolvency fund's parsing of the definitional changes to the term "person" in the 1996 amendment. See *supra* at 596. In our view, consistent with our obligation to read G. L. c. 176D as a whole, a proper reading of the definition of "person" in G. L. c. 176D, § 1 (*a*), encompasses any legal entity that is engaged in the business of insurance, "including agents, brokers, and adjusters, the [insolvency fund] and any joint underwriting association established pursuant to law," bringing the insolvency fund within the definition of a legal entity engaged in the business of insurance.

[24]General Laws c. 176D, § 3, defines certain acts as "unfair methods of competition and unfair or deceptive acts or practices in the business of insurance." General Laws c. 176D, §§ 3A, 3B, and 4, define additional prohibited acts.

[25]General Laws c. 176D, § 6, permits the commissioner to pursue enforce-

unfair or deceptive act or practice in the business of insurance."
G. L. c. 176D, § 2. Thus the insolvency fund recognizes that
the 1996 amendment subjected it to the enforcement authority
of the commissioner if it engaged in acts defined as occurring
"in the business of insurance." G. L. c. 176D, §§ 2, 3. To
argue, as the insolvency fund does, that the 1996 amendment
defined the insolvency fund as *not* being a "person engaged in
the business of insurance" but simultaneously subjected it to the
enforcement authority of the commissioner for acts occurring
"in the business of insurance" strains the language of the statute
beyond reason. In effect, the insolvency fund argues that,
whenever it engages in any unfair methods of competition and
unfair or deceptive acts "in the business of insurance" prohibited
by G. L. c. 176D, §§ 2 and 3, it *is* "in the business of insurance"
for purposes of the regulatory provisions of G. L. c. 176D, but it
is *not* "in the business of insurance" for other purposes of that
chapter. There is no language in the statute to support that tortured
interpretation.

The insolvency fund also notes that the 1996 amendment did
not refer to the insolvency fund in the second sentence of G. L.
c. 176D, § 1 (*a*): "For purposes of this chapter, operators of any
such medical and hospital service plans shall be deemed to be
engaged in the business of insurance." G. L. c. 176D, § 1 (*a*),
as amended through St. 1996, c. 313. See note 3, *supra.* That
sentence was unchanged by the 1996 amendment, compare St.
1996, c. 313, with St. 1972, c. 543, § 1, but does not support the
insolvency fund's argument that the insolvency fund is not
"engaged in the business of insurance." Rather, the sentence
clarifies that the provisions of G. L. c. 176D apply to the medical
and hospital service plans specified in the first sentence of the
definition of "person" in G. L. c. 176D, § 1 (*a*), see note 3, *supra*, despite the exemptions from the Commonwealth's general
insurance laws granted to such organizations in other statutes.
See, e.g., G. L. c. 176B, § 14; G. L. c. 176C, § 2.

Beyond the language of the 1996 amendment and the other

---

ment actions against "any such person" — i.e., "every person engaged in the
business of insurance in this commonwealth," as described in G. L. c. 176D,
§ 5 — for engaging in "any unfair method of competition or any unfair or
deceptive act or practice whether or not defined in sections three or four."
G. L. c. 176D, § 6.

provisions of G. L. c. 176D, there is a second and independent reason why we reject the insolvency fund's interpretation. Even were we inclined to adopt the insolvency fund's construction of "[p]erson" in G. L. c. 176D, § 1 (*a*), the insolvency fund nevertheless would not be insulated from G. L. c. 93A liability to a consumer. Central to the insolvency fund's position is its assertion that it *is* subject to enforcement actions by the commissioner *if* it violates any provision of G. L. c. 176D, § 3. It thereby concedes that there are circumstances in which it could be, in the language of the *second* prong of G. L. c. 93A, § 9 (1), a "person violating the provisions of [G. L. c. 176D, § 3 (9)]." See *supra* at 599-600. There can be no doubt that the insolvency fund is a "person" under the second prong of G. L. c. 93A, § 9 (1), for G. L. c. 93A, § 1 (*a*), defines a "person" as including "any" legal entity. If the insolvency fund can be a "person violating the provisions of [G. L. c. 176D, § 3 (9)]," it is subject to a consumer action brought under the second prong of G. L. c. 93A, § 9 (1), regardless of how one reads the 1996 amendment.[26]

The insolvency fund argues that subjecting it to G. L. c. 93A consumer actions would be a "radical change" in the law, pointing out that it "is not to be lightly supposed that radical changes in the law were intended where not plainly expressed." *Ferullo's Case*, 331 Mass. 635, 637 (1954). See *Commissioner of Corps. & Taxation* v. *Dalton*, 304 Mass. 147, 150 (1939) ("A matter may be within the letter of a statute and not come within its spirit, if the matter is beyond the mischief intended to be reached or if to include it would require a radical change in established public policy or in the existing law and the act does not manifest any intent that such a change should be effected"). Even if subjecting the insolvency fund to G. L. c. 93A consumer actions is a "radical change" in the law, a point we need not

---

[26]The insolvency fund also argues that the 1996 amendment does not define the insolvency fund as a person "in the business of insurance," because "it is plain" that the amendment does not result in the insolvency fund being a "company" for purposes of G. L. c. 175, which defines "company" as "all . . . associations . . . engaged as principals in the business of insurance." G. L. c. 175, § 1. Our reasoning, which relies on the particular language and interconnection of G. L. c. 176D and G. L. c. 93A, § 9, does not require us to decide whether the insolvency fund satisfies the definition of "[c]ompany" in G. L. c. 175, § 1.

resolve, in our view the Legislature "plainly expressed" its intent to subject the insolvency fund to consumer actions under G. L. c. 93A, § 9 (1), when it amended G. L. c. 176D, § 1 (*a*), in the wake of *Barrett* and *Poznik*.[27]

The insolvency fund points to the legislative history to support its argument that the Legislature did not intend to subject the insolvency fund to G. L. c. 93A consumer actions when it enacted the 1996 amendment. Ordinarily we would not consider the argument because in our view the statute is not ambiguous. See *Hoffman* v. *Howmedica, Inc.*, 373 Mass. 32, 37 (1977) (where language of statute is unambiguous, "legislative history is not ordinarily a proper source of construction"). In any event, such sparse indications of legislative intent as do exist reinforce our conclusion. As originally proposed, the title to 1995 House Doc. No. 4950, later enacted, was "An Act to equalize the application of fair competition requirements." Although the substance of the bill remained unaltered in any relevant respect, on its third reading in the House of Representatives, the title was changed to "An Act relative to fair competition requirements *in the business of insurance*" (emphasis added). St. 1996, c. 313. Further, the timing of the amendment, see note 12, *supra*, and the coupling of the insolvency fund with joint underwriting associations — entities with little else of relevance in common with the insolvency fund — suggest that the Legislature intended the amendment to be a response to this court's decisions in *Barrett* and *Poznik*. As *Barrett*, *supra* at 777, and *Poznik*, *supra* at 53, concluded, respectively, that the insolvency fund and a statutorily established joint underwriting association were not subject to G. L. c. 93A consumer actions, the most

[27]After the 1996 amendment, the Appeals Court has assumed that joint underwriting associations are now subject to G. L. c. 93A consumer actions. See *Bolden* v. *O'Connor Café of Worcester, Inc.*, 50 Mass. App. Ct. 56, 57 n.3, 59 n.8, 64-71 (2000), quoting *Jimmy's Diner, Inc.* v. *Liquor Liab. Joint Underwriting Ass'n of Mass.*, 410 Mass. 61, 64 (1991) (in considering motion to intervene by Liquor Liability Joint Underwriting Association of Massachusetts [LLJUAM], "a nonprofit, 'statutorily mandated agglomeration of every personal liability insurer operating in the Commonwealth,'" court assumed that LLJUAM is subject to G. L. c. 93A claims for unfair settlement practices in violation of G. L. c. 176D, § 3 [9]). The insolvency fund effectively concedes that its interpretation of the 1996 amendment is at odds with this approach, given the amendment's "parallel treatment," in the words of the insolvency fund, of joint underwriting associations and the insolvency fund.

straightforward inference is that the Legislature intended to abrogate both of those decisions.[28]

The indicia of legislative intent cited by the insolvency fund — a memorandum from the Governor's chief legal counsel to the Governor and two related memoranda from the Office of Consumer Affairs and Business Regulation to the Governor's legislative office — do not suggest otherwise.[29] The former states that the 1996 amendment "provides" that the insolvency fund and joint underwriting associations "are subject to the same standards which apply to others operating in the insurance business" and "extends the authority of the [commissioner] to protect consumers." The insolvency fund points to the reference to the enforcement powers of the commissioner only. But more is reflected in that memorandum, and it is beyond dispute that the "standards" that applied at the time to "others operating in the insurance business" included subjection to G. L. c. 93A consumer actions. See, e.g., *Williams* v. *Gulf Ins. Co.*, 39 Mass. App. Ct. 432, 435-437 (1995) (insurer liable to insured under G. L. c. 93A, § 9, for failure to "effectuate prompt, fair and equitable settlement[]" of claim in which liability had "become reasonably clear," in violation of G. L. c. 176D, § 3 [9] [*f*]). The latter two memoranda cited by the insolvency fund express support for the 1996 amendment because its adoption would cause the insolvency fund to "come under the [commissioner's] supervisory and enforcement authority of G. L. c. 176D," a point not in dispute. Silence in those memoranda on the broader impact of the legislation is insufficient to overcome the import of the unambiguous statutory language.

Finally, citing various provisions of G. L. c. 175D, the insolvency fund argues that the Legislature has "taken great pains" to

---

[28]The insolvency fund argues that, when it adopted the 1996 amendment, the Legislature "gave no thought at all" to subjecting the insolvency fund to consumer actions under G. L. c. 93A, "but rather intended only to subject the [insolvency fund] to enforcement by the [commissioner] with respect to activities prohibited by c. 176D." This argument is difficult to square with the insolvency fund's recognition at oral argument that the 1996 amendment was a response to *Barrett* and *Poznik*.

[29]Such documents are from government actors beyond the legislative branch, and we place no undue weight on their significance. Cf. *Hershenow* v. *Enterprise Rent-A-Car Co. of Boston*, 445 Mass. 790, 798 n.16 (2006) (citing "notation" from Governor's chief legal counsel in construing legislative amendment).

limit the insolvency fund's obligations in order to preserve the insolvency fund's "limited financial resources" and "limit the burden on the public," which will bear the "ultimate financial responsibility" for any G. L. c. 93A awards,[30] and the insolvency fund notes that the Legislature made no change to G. L. c. 93A and no change to G. L. c. 175D in the 1996 amendment. The insolvency fund argues that interpreting the 1996 amendment as subjecting it to G. L. c. 93A consumer actions, as we do, would mean necessarily that there is "no limit" on the insolvency fund's liability, a result discordant with the Legislature's efforts to limit the insolvency fund's obligations. We conclude today only that the insolvency fund is subject to G. L. c. 93A consumer actions. We do not consider and do not decide whether any of the statutory limitations on the insolvency fund's obligations to pay claims set forth in G. L. c. 175D and elsewhere apply as well to any damages that may be awarded against the insolvency fund under G. L. c. 93A. In this case, the insolvency fund may or may not be held liable under G. L. c. 93A, and we decline now to reach any question of what the scope of any such

---

[30]See G. L. c. 175D, § 1 (2) (definition of "covered claim" insolvency fund is obligated to pay is limited to "unpaid" claims, and excludes "any amount due a reinsurer, insurer, insurance pool or underwriting association"); G. L. c. 175D, § 5 (1) (*a*) (insolvency fund's obligation on "covered claims," other than workers' compensation claims, limited to amounts "less than three hundred thousand dollars"); G. L. c. 175D, § 5 (1) (*c*) (if insolvency fund has insufficient financial resources to make all necessary payments in any one year, "the funds available may be prorated and the unpaid portion shall be paid as soon thereafter as funds become available"); G. L. c. 175D, § 5 (1) (*d*) (insolvency fund shall "adjust, compromise, settle and pay covered claims to the extent of [its] obligation and shall deny all other claims"); G. L. c. 175D, § 9 (amount payable on covered claims reduced by amount of recovery under claimant's policy or from any other insurers' insolvency fund or its equivalent); G. L. c. 175D, § 11 (insolvency fund is "exempt from payment of all fees and all taxes levied by the commonwealth or any of its subdivisions except taxes levied on real or personal property"); G. L. c. 175D, § 15 (proceedings automatically stayed "in any court in this commonwealth" in which insolvent insurer is party "to permit proper defense by the [insolvency fund] of all pending causes of action").

The insolvency fund cites, in addition, G. L. c. 175D, § 17, which exempts the insolvency fund from any obligation to pay a first party claim by a "high net worth insured," as defined therein. That section was inserted by St. 2006, c. 342, § 2, and applies to only those insolvent insurers that are so determined on or after the effective date of that act (Feb. 3, 2007). See St. 2006, c. 342, § 3.

hypothetical liability or damages might be were it to be found liable.

3. *Conclusion.* For the reasons stated above, the judgment is reversed and the case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*